**UNITED STATES of America, Appellee,**

v.

**Joseph SCELZO, Defendant, Appellant.**

**No. 86–1398.**

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1986.

Decided Jan. 23, 1987.

David L. Martin, Providence, R.I., by Appointment of the Court, for appellant.

Seymour Posner, Asst. U.S. Atty., Providence, R.I., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and PIERAS,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

After a jury trial in the United States District Court for the District of Rhode Island, Joseph Scelzo was found guilty of conspiring to commit wire and credit card fraud, 18 U.S.C. § 371 (1982); devising a scheme to defraud banks by using interstate wire communication to obtain authorizations for credit card sales, 18 U.S.C. § 1343 (1982); and using, in interstate commerce, counterfeit credit cards to obtain money aggregating $1,000 or more, 15 U.S.C. § 1644(a) (1982). On appeal, Scelzo claims that prejudicial evidence was erroneously admitted at trial, and that a necessary jury instruction was omitted. We affirm.

Scelzo was indicted with co-defendants Sheldon Ellman and Sylvio Mollicone who, before trial, pleaded guilty and agreed to testify against him in return for the dropping of 23 of the 28 counts against them. As the main witnesses against Scelzo, they testified that in July 1984 Ellman, the owner of Tolchinsky Furs in Providence, Rhode Island, and of Lassow's Furs in New Bedford, Massachusetts, was approached by Mollicone with a scheme to use counterfeit credit cards in connection with Ellman's fur business. Mollicone and Scelzo met with Ellman at the latter's Rhode Island store in August, and the three initiated a credit card fraud scheme which lasted two months. Using counterfeit credit cards supplied by Scelzo, Ellman fabricated credit card receipts. He then submitted these to his bank as purported evidence of credit card charges received for furs allegedly sold. The bank credited his account with the amounts reflected on the bogus receipts. Eventually, card owners whose genuine cards had been counterfeited received bills and notified the credit card companies that they had not made the purchases shown. The banks, having already credited the money to Ellman's account, suffered the loss. Ellman and Mollicone testified that not only did Scelzo supply the counterfeit cards, he also supplied the valid names, credit card numbers, and expiration dates, and signed each of the fraudulent credit card slips.

Besides Ellman and Mollicone, the government called as witnesses two of Ellman's employees. They testified that they frequently saw Scelzo in the Providence store together with Mollicone, and that Mollicone and Scelzo occasionally left with fur coats.

The government also called Stephen Novosedlik, a former secret service agent. He testified that in May of 1984, while acting in an undercover capacity as a collusive merchant in New Jersey, he met with Scelzo. Scelzo at this time provided him with counterfeit credit cards to be used in a scheme similar to that charged in this case. During direct examination, Novosedlik was allowed to testify that Scelzo told him that he had been engaged in credit card fraud for years.

I.

Scelzo argues that it was error for the court to admit Novosedlik's testimony of Scelzo's involvement in a prior credit card fraud scheme in New Jersey. Scelzo argues that this testimony lacked special probative value and that any probative value it had was outweighed by its prejudicial effect. Fed.R.Evid. 403, 404(b).

The government may not introduce evidence that an accused has engaged in other crimes in order to cause the jury to infer from the accused's bad character that he acted in conformity with that character. However, evidence of past crimes may be admissible specifically to prove motive, opportunity, intent, knowledge, identity, or absence of mistake. Fed.R.Evid. 404(b). The procedure governing admission of such evidence has often been described in this circuit. *See United States v. Kadouh*, 768

* Of the District of Puerto Rico, sitting by designation.

F.2d 20, 21 (1st Cir.1985); *United States v. Maldonado-Medina,* 761 F.2d 12, 15 (1st Cir.1985); *United States v. Morris,* 700 F.2d 427, 431 (1st Cir.), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir.1982). As a first step, the judge determines whether the evidence has some "special" probative value that would show intent, preparation, knowledge, or absence of mistake. *United States v. Kadouh,* 768 F.2d at 21. As a second step, the judge balances the evidence's probative value against the prejudice to the defendant. *Id.* The balancing is committed to the district judge's discretion, and will be reversed only for an abuse of discretion. *Id.*

The court here followed the above procedure, concluding that Novosedlik's testimony concerning Scelzo's past participation in a credit card scheme was admissible. The court also gave a limiting instruction just before Novosedlik testified. It told the jury not to infer from evidence of past wrongs a character trait and from that to infer that Scelzo acted in conformity with the character trait. The court explained that the jury could, however, use the evidence to help determine issues in the case with respect to motive, opportunity, intent, preparation, plan or knowledge. The court cautioned that these were the only purposes for which the jury could use the testimony.

■ We have little difficulty in concluding that the evidence of Scelzo's prior involvement in a credit card scheme was specially probative of his knowledge and intent in respect to the credit card scheme forming the basis of the current indictment. *See United States v. Moccia,* 681 F.2d at 63 (evidence of past convictions for possession of marijuana relevant to show knowledge at subsequent trial for possession of marijuana); *United States v. Maldonado-Medina,* 761 F.2d at 15 (evidence of prior kidnapping perpetrated in very similar manner had special probative value at trial for second kidnapping). *See also United States v. Bice-Bey,* 701 F.2d 1086 (4th Cir.),

*cert. denied,* 464 U.S. 837, 104 S.Ct. 126, 78 L.Ed.2d 123 (1983) (evidence of prior fraudulent credit card transactions relevant to rebut claim of inadvertent or innocent involvement in later credit card fraud).

Conspiracy, one of the charges against Scelzo, is an offense in which knowing participation and intent is an issue of crucial import. *United States v. Crocker,* 788 F.2d 802, 804 (1st Cir.1986) (intent a relevant issue for conspiracy charge); *United States v. Zeuli,* 725 F.2d 813, 816 (1st Cir. 1984) (plea of not guilty to charge of conspiracy renders intent a material issue and imposes a difficult burden on government). We have thus held that evidence of similar past crimes or wrongful acts may be especially appropriate in conspiracy prosecutions. *See United States v. Crocker,* 788 F.2d at 804 (evidence of prior arrest for uttering counterfeit checks relevant to show intent in subsequent trial for conspiracy to cash counterfeit checks); *United States v. Zeuli,* 725 F.2d at 816 (evidence of prior extortion demands relevant to prove intent in a conspiracy to extort charge).

We reject Scelzo's assertions that the prior scheme in New Jersey lacked sufficient similarity to the present one to make evidence thereof probative. In both schemes appellant supplied valid cardholder information, including names, account numbers, and expiration dates. In both schemes appellant supplied the counterfeit cards for imprinting. In each scheme appellant allegedly advised the merchant on how to perpetrate the scheme and signed each fraudulent credit sales slip.

Simply because there was some variation in peripheral facts (*e.g.,* in the New Jersey scheme the imprinting and signing of the fraudulent sales slips took place away from the merchant's business, whereas in the present case the imprinting and signing took place at the merchant's business) does not lessen the probative value of this evidence. *See United States v. O'Brien,* 618 F.2d 1234, 1238 (7th Cir.1980) (similar wrongful acts needs not be duplicates; "the degree of similarity is relevant only insofar as the acts are sufficiently alike to

support an inference of criminal intent"). In the present case, the two schemes were clearly close enough to support an inference of intent.

■ Scelzo further argues that this evidence was prejudicial because he was being tried for the exact same crime: fraudulent credit card activity. It is true that this evidence has the possibility of being prejudicial; but this is inevitably true since, for such evidence to be properly admitted, it must have a similarity sufficient to be probative. *See supra.* Thus the possibility of prejudice is always present in these cases, since the prior wrongful acts will be at least similar if not nearly identical. The prior wrongful act was not, however, shocking or heinous and so was not likely to inflame the jury. *See United States v. Moccia,* 681 F.2d at 63–64. On this record we cannot say that the district court abused its discretion.

## II.

■ Scelzo also asserts that the district court erred in refusing to grant his motion for a mistrial made after Novosedlik testified that Scelzo had told him he had been doing this type of fraudulent credit card activity for years. The court denied the motion on the grounds both that there had been no objection to the question and that the testimony was no more prejudicial than the rest of Novosedlik's testimony concerning Scelzo's prior involvement in the other fraudulent scheme in New Jersey.

The challenged testimony arose after the United States Attorney asked Novosedlik: "During your discussion with him [appellant] in the diner, did he ever say how long he had been doing this type of activity?" To which Novosedlik replied, "Yes, Joey said he had been doing this for years."

Scelzo's counsel asserted that he did not object as soon as the *question* itself was asked (and before the answer) because he did not know that the agent would give the response he did; that he was unaware that the government intended to elicit that information; that he was surprised by the witness's testimony; and that nothing the

government had provided put him on notice that Novosedlik would so testify. However, prior to the agent's testimony, the government had given counsel and the court a copy of the witness's report, detailing what transpired and what was said during the New Jersey credit card fraud scheme about which the witness was to testify. The report contained the following: "Scelzo again talked about his counterfeit credit card transactions with collusive merchants in the New York-New Jersey area. Scelzo said he has been doing this for years and that I would have nothing to worry about." This was sufficient to apprise Scelzo's counsel that the agent might testify concerning the purported statement; counsel could have anticipated Novosedlik's response and thus objected to the question, rather than allowing it to be answered, and then moving for a mistrial.

Moreover, we cannot say the court abused its discretion in deciding that this one statement was no more prejudicial than the other evidence of Scelzo's prior credit card fraud activities. *See United States v. McDonald,* 576 F.2d 1350 (9th Cir.), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978) (in trial for mail fraud, trial court did not abuse discretion in deciding that probative value of defendant's inculpatory statements made during prior fraudulent transaction was not outweighed by prejudice).

Finally, we observe that the evidence in this case against appellant, including the testimony of his co-conspirators, was exceedingly strong. The court did not err in denying appellant's motion for mistrial.

## III.

■ Scelzo claims that the district court's refusal to give a cautionary instruction—to the effect that co-conspirators' testimony should be viewed with caution—was reversible error. Scelzo had asked for such an instruction, but the court refused to give it because it felt that the instruction might confuse the jury; because it planned to instruct the jury to consider the interest or lack of interest in the outcome of the case by any witness; and because there

was sufficient independent evidence to corroborate the co-conspirators' testimony.

Referring to a co-conspirator's testimony, this circuit has said that while "it is prudent for the court to give a cautionary instruction, even when one is not requested, failure to do so is not automatic error especially where the testimony is not incredible or otherwise insubstantial on its face." *United States v. Wright*, 573 F.2d 681, 685 (1st Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). *See also United States v. House*, 471 F.2d 886, 888 (1st Cir.1973). In the present case, the defense counsel, during cross-examination, brought out Ellman's and Mollicone's personal interest in providing testimony against Scelzo, and the court instructed the jury to consider every witness's interest or lack of interest. Aspects of Ellman's and Mollicone's testimony were, moreover, corroborated by both the testimony of two of Ellman's employees, and by the fraudulent credit card slips, which were put in evidence.

The district court clearly believed the co-conspirators' testimony to be credible and reliable. At a hearing on appellant's motion for a new trial, the court stated:

> The witnesses, Mr. Mollicone and Mr. Ellman who testified, insofar as the record is concerned were people who up until Mr. Scelzo's association had never been in trouble before and are now both facing jail sentences, and I am satisfied from their appearance on the witness stand that they were telling the truth, the whole truth and nothing but the truth.... They were impressive witnesses, people who were, as far as I could see, were telling the truth about an incident which at their time in life should not have ever occurred. They had too much to lose and nothing to gain by their participation as witnesses here.... I am satisfied that both of them are thoroughly credible and believable witnesses.

Appellant makes much of alleged inconsistencies between Mollicone's and Ellman's testimony with regard to how the proceeds of these illegal transactions were to be divided between the participants, and how much each participant actually received. The district court plausibly observed, however, that in view of the numerous fraudulent transactions that occurred in this case, "it is quite likely that all of the details are not recalled with absolute and total and complete accuracy."

On this record we cannot say the refusal to give a cautionary instruction was reversible error.

*Affirmed.*