932 F.2d 964
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David O. SANCHEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Luis A. ROMERO-COLATO, Defendant-Appellant.
 No. 90-5836.
 United States Court of Appeals, Fourth Circuit.
 Argued March 4, 1991.
Decided May 6, 1991.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, District Judge. (CR-90-97-A)
 Robert Stanley Powell, Powell & Colton, P.C., Alexandria, Va., (argued), for appellants; Alan Yamamoto, Fairfax, Va., on brief.
 Kenneth E. Melson, Assistant United States Attorney, Alexandria, Va., (argued), for appellee; Henry E. Hudson, United States Attorney, Alexandria, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and RESTANI, Judge, United States Court of International Trade, Sitting by Designation.
 PER CURIAM:
 
 
 1
 Appellants appeal their convictions for kidnapping and conspiracy to kidnap, arguing that the evidence presented at trial was insufficient to convict them. They further contend that the government violated their due process rights by failing to disclose information to them, and that the trial court abused its discretion in failing to strike overt acts 13, 14, and 15 because the kidnapping victim referred to in those acts was not transported across state lines and, therefore, that kidnapping could not constitute an overt act of a conspiracy to kidnap. For the following reasons, the court finds appellants' arguments unpersuasive and affirms the judgment of the district court.
 
 Background
 
 2
 The charges against appellants originated in the kidnappings, rapes, and robberies of three women between February 9, 1989 and March 18, 1989. The first victim, Daphne Anne Palmer, was abducted while walking in the District of Columbia on February 9, 1989. A gunman and another man forced Ms. Palmer into a car, which she described as a maroon or dark colored two-door Blazer or Bronco type. Ms. Palmer was taken to a construction site where she was blindfolded and then raped by both assailants.[1] The two men then drove her to a convenience store where they transferred her to a second vehicle, which she described as a light colored Datsun-like vehicle. Ms. Palmer was released by her assailants in the District of Columbia and was told that if she looked back at them, they would shoot her.
 
 
 3
 On February 18, 1989, Dominique Ritley was abducted as she was walking in the District of Columbia. A man with a gun approached her and, with the help of a second man, forced her into a car. She described the vehicle as an older sports car, like a 280 ZX. While in the car, her assailants robbed her of $20 cash, a bracelet and a ring. Her captors stopped in a bank parking lot and looked in her purse for a bank card which they did not find. They then drove to a construction site, gagged the victim and raped her. Both of the assailants wore condoms. Ms. Ritley was taken back to the car and ultimately released in Arlington. As she was being released, one of the assailants warned her that if she looked back he would kill her.
 
 
 4
 Ms. Ritley was treated at National Orthopedic Hospital and physical evidence was collected. With Ms. Ritley's aid, the police located the construction site where she had been raped. Two condoms were recovered from the area.
 
 
 5
 On March 18, 1989, Diana Wilson Brockman[2] was driving on U.S. Route 50 in northern Virginia when another vehicle, which she described as a red Bronco or Blazer, forced her vehicle off the road. The passenger from the offending vehicle approached her vehicle, pulled a gun and forced Ms. Brockman into the passenger seat. He robbed her of $7 cash and a watch. Ms. Brockman was driven to another location where she was transferred to her assailants' vehicle. Ultimately the assailants drove her to a different location where she was raped. Ms. Brockman's description of her assailants' vehicle corresponded with a Ford Bronco owned by Sanchez. Ms. Brockman also was able to identify both appellants as the men who abducted her. Both appellants were arrested and at this time the police recovered a gun from the Bronco. The police also seized Romero-Colato's vehicle, a white Toyota Celica. Subsequent to the issuance of search warrants, both vehicles were searched by the FBI and hair and fibers were collected from the interiors. Blood and other samples were obtained from appellants.
 
 
 6
 At trial the government presented its case through the testimony of the three victims, police officers who worked on the case, and FBI Special Agents who examined the hair and fibers collected and conducted DNA profiling on the semen material found in the condoms.
 
 
 7
 Special Agent Paul Arthur Bennett testified concerning hairs found in the Toyota Celica and concluded that eleven hairs "could have originated from Dominique Ritley." Appendix ("App.") at 381. Agent Bennett also compared various fibers obtained from the carpet and seats of the Toyota Celica to the fibers found on Ms. Ritley's pants, shoes and the hospital sheet used in her examination. He found that many of the same microscopic characteristics were present in both the fibers from the seat covers and carpet and the fibers from Ms. Ritley's clothing. Agent Bennett stated that in his opinion it was "extremely probable that Dominique Ritley was in that Toyota vehicle." App. at 389.[3]
 
 
 8
 Special Agent John Roy Brown testified concerning the blood grouping tests run on the semen collected from the condoms. Agent Brown identified the blood groups on the semen samples as containing both A and H blood group substances. Romero-Colato's blood grouping contained A blood grouping characteristics, in other words, he was an "A secreter." Agent Brown testified that approximately thirty percent of the population are A secreters. He further testified that Sanchez was an "O secreter." Agent Brown stated that he could not tell whether or not an O secreter contributed to the semen.
 
 
 9
 The FBI also conducted a DNA profiling on the semen material extracted from the condoms and compared the results to those obtained from profiles of known samples from the appellants. Special Agent Lawrence A. Presley testified that the likelihood of another person having the same profile as Romero-Colato was one in 49,000. In the case of Sanchez, the chance was approximately one in 719,000. To enable them to defend against this testimony, eleven days before trial appellants requested five categories of information relating to the DNA profiling conducted in the case.[4] The government produced all of the requested information with the exception of the data relating to the proficiency testing.[5] The district court reviewed the proficiency testing results in camera and concluded that no exculpatory evidence existed which should be provided to the appellants.
 
 Discussion
 
 10
 Appellants contend that the jury verdict was not supported by substantial evidence.[6] Specifically, they contend that the trial was fatally flawed for two reasons: the district court did not order the production of the FBI DNA proficiency tests and failed to strike overt acts 13, 14 and 15 from the indictment. Initially the court notes that there was a plethora of evidence supporting the jury verdict even absent the testimony of Ms. Brockman and the DNA evidence.[7] Moreover, we conclude that the trial judge did not err in regard to this matter.
 
 
 11
 As to the DNA proficiency test data, the district court found that this data, the only information denied to appellants, would not have tended to exculpate appellants if it had been admitted.[8] First, the judge determined that the material was not Brady material. Nothing in the record indicates that he erred. Second, the FBI conducts proficiency tests to determine whether or not the examiners are following the FBI protocol and procedures.[9] Confidentiality is essential to ensure a candid review and critique of that particular examiner's performance. The district court apparently concluded that, apart from Brady issues, the proficiency tests need not be revealed or admitted into evidence because appellants received all material information about the DNA testing process and the results in this case to assess reliability directly. The purpose of the proficiency report was not to further the particular prosecution at issue. The court did not err. See, e.g., United States v. Orzechowski, 546 F.2d 978, 984 (7th Cir.), cert. denied, 431 U.S. 906 (1977) (Rule 16(a)(1)(D) limits discovery to those items which are material to the preparation of the defense in that particular case).
 
 
 12
 Appellants argue that the district court erred when it failed to strike the testimony concerning the kidnapping of Diana Brockman. The court rejected appellants' argument that the Brockman kidnapping could not constitute an overt act of a conspiracy to kidnap because the victim was not transported across state lines, citing United States v. Medina, 761 F.2d 12 (1st Cir.1985). Clearly under Medina the lack of interstate transportation would not be fatal to the conspiracy charge, provided that at least one victim was transported across state lines. In Medina, the indictment charged defendant with a conspiracy to commit extortion by kidnapping Mario Consuegra and holding him for ransom. Previously the defendant had kidnapped Julio Melendez, but no federal charges had been brought in that case because of the lack of a connection to interstate commerce. The Melendez kidnapping was alleged as an overt act and the First Circuit permitted this noting:
 
 
 13
 It has been established beyond challenge that an overt act need not be the substantive crime that is the object of the conspiracy, nor even criminal in character; its function is to show the operation of the conspiracy.... But it does not follow from this that an overt act cannot be another crime.... Defendant has cited no cases, and we have found none, holding that an overt act cannot be another crime or that, if it is, it must be a federal crime. Such a proposition runs directly counter to the function of an overt act, "to demonstrate the conspiracy's existence, i.e., to prove that it is at work."
 
 
 14
 761 F.2d at 15 (citations omitted). This reasoning appears fully applicable here. The Brockman overt act fills out the picture of the conspiracy. The district court alternatively based its decision to admit the testimony of Ms. Brockman on Federal Rule of Evidence 404(b).[10] The trial judge stated that "[t]he MO of the defendants does show intent, motive, plan, so I would admit it." App. at 347. After balancing the possible prejudice from such testimony against its probative value, the trial judge determined that the probative value outweighed any prejudice which might result. The court expressly based its approach on United States v. Masters, 622 F.2d 83 (4th Cir.1980), a case in which we examined in detail the types of evidence which might be admitted under Rule 404(b) and the balancing test which must be undertaken before these acts are admitted.
 
 
 15
 Given that the other two women provided equally, if not more, horrific descriptions of their kidnapping and rape, the district court properly found that the Brockman testimony did not create unfair prejudice outweighing its probative value. We also note that the trial judge gave an appropriate limiting instruction before permitting Ms. Brockman to testify.
 
 Conclusion
 
 16
 The overwhelming evidence presented at trial clearly supports the jury verdict. The proficiency tests of the DNA expert were the only tests which were denied appellants, were found to be nonexculpatory, and were not necessary to cross-examination of the expert or to challenge of the DNA test results themselves. The trial judge did not err in permitting the government to allege the overt acts relating to Diana Brockman. Furthermore, the trial judge carefully examined the Brockman evidence and ruled that the prejudicial effect of the evidence did not outweigh its probative value in proving the modus operandi of appellants.
 
 
 17
 Accordingly, we affirm the judgment of the district court.
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 Ms. Palmer testified that she overheard the two men talking to each other and thought she overheard them going through her purse and briefcase. Later she discovered that two cassette tapes were missing and her wallet was in disarray
 
 
 [2]
 Both appellants pleaded guilty in Fairfax Circuit Court to the robbery and abduction of Ms. Brockman and the use of a firearm in the commission of a felony. The kidnapping of Ms. Brockman was not charged in a substantive count in the indictment in this case. The facts surrounding this kidnapping, however, were incorporated into the conspiracy to kidnap count, as overt acts in furtherance of the objects of the conspiracy
 
 
 [3]
 No matching hairs or fibers were found in the Ford Bronco
 
 
 [4]
 Appellants requested information concerning any material discussing the FBI's criteria used in matching the DNA strands, studies evaluating environmental effects on the samples, genotype data compiled by the FBI for its population data bases, and all procedures followed and results compiled in this particular profiling, as well as all proficiency tests conducted on that examiner
 
 
 [5]
 Proficiency evidence relates to the proficiency of the agent conducting the tests. A test is sent to the examiner (the agent conducting the test) and the answers are graded by the FBI. The purpose is to see whether the examiners are following the FBI protocol and procedures. The district court referred to this as an "in-house check." App. at 172
 
 
 [6]
 A jury verdict in a criminal case "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Steed, 674 F.2d 284, 286 (4th Cir.), cert. denied, 459 U.S. 829 (1982)
 
 
 [7]
 In Ms. Ritley's case, direct evidence existed which consisted of her identification of the appellants. The circumstantial evidence was overwhelming and included hair and textile fibers along with testimony that it was very probable that Ms. Ritley was in the Toyota Celica, accurate testimony by the victim which described the interior of the Celica, and a gun found in the Ford Bronco which resembled the gun used in the kidnapping
 In Ms. Palmer's case there was also direct evidence in that she identified both appellants before and at trial. Circumstantial evidence included a blindfold found in the Bronco which Ms. Palmer testified looked and felt like the blindfold used on her, a jacket found in the Celica which Ms. Palmer stated looked like the jacket worn by the gunman (Romero-Colato), and the same modus operandi used in the other case.
 
 
 [8]
 In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Court held that prosecutorial suppression of evidence favorable to a defendant who has made a request for it amounts to a violation of due process where such evidence is material either to guilt or punishment. Appellants point to the judge's statement that some of the material dealt with scientific matters which he "could not understand." App. at 267. The district judge, however, did state that the material set forth conclusions and comments which he was able to understand. We have reviewed the DNA proficiency report and find nothing that would cause us to question the finding of the trial court
 
 
 [9]
 We note that the Assistant United States Attorney indicated to counsel for defendants that he had been advised by the FBI that the tester in this case had never made an error which was material to the DNA analysis in any case. App. at 161, 169-71
 
 
 [10]
 This rule provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove character but may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident